IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs at Knoxville July 23, 2024

**STATE OF TENNESSEE v. JAY JAMES MACKEN**

**Appeal from the Criminal Court for Jackson County**
**No. CC-2019-CR-40      Brody N. Kane, Judge**

_____

**No. M2022-01809-CCA-R3-CD**
_____

Jay James Macken, Defendant, was convicted of aggravated assault, aggravated rape, especially aggravated kidnapping, and interference with emergency communication after a jury trial. The trial court sentenced him to an effective sentence of 20 years. After the denial of a motion for new trial, Defendant sought review of his convictions in this Court. On appeal, Defendant challenges the sufficiency of the evidence to support his convictions for aggravated assault and especially aggravated kidnapping. Because the evidence supported the convictions, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

TIMOTHY L. EASTER, J., delivered the opinion of the court, in which TOM GREENHOLTZ and MATTHEW J. WILSON, JJ., joined.

M. Todd Ridley, Assistant Public Defender – Appellate Division (on appeal); Douglas K. Dennis (at trial) Cookeville, Tennessee, for the appellant, Jay James Macken.

Jonathan Skrmetti, Attorney General and Reporter; William C. Lundy, Assistant Attorney General; Jason L. Lawson, District Attorney General; Ian Bratton and Thomas Swink, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

On December 10, 2018, the Jackson County Sheriff's Department responded to a 911 hang-up call at Defendant's residence. He lived at a home in Gainesboro with his wife, the victim, and their six-year-old triplets. When police arrived at the home, they heard "blood[-]curdling screams" coming from inside the house. Detective Kamron Johnson and

Deputy Cody Buck broke through the locked front door of the residence. Once inside, they saw Defendant lying naked on top of the victim in the kitchen. The victim was naked from the waist down. Defendant was "actively biting" the victim's stomach. Detective Johnson described it as "[o]ne of the wors[t] things [he had ever] seen in law enforcement." Deputy Buck described Defendant's actions as "cannibalism." Defendant's "teeth were on her stomach, trying to take flesh and skin away from her body." The victim was "screaming" and trying to escape. Detective Johnson observed that the "standard house phone" had been unplugged from the wall and "rendered unusable."

Detective Johnson and Deputy Buck separated Defendant from the victim. One of them helped the victim move from the kitchen to a safer location. She was bleeding and had multiple injuries including "[s]everal bite marks." The victim told officers that "her genitalia region had been bit and mutilated." Deputy Buck noted that "there were chunks of flesh" or "pieces missing from [the victim] that were not on the floor, that were not still attached to her, so that they [were] gone." Detective Johnson contacted emergency medical personnel and then checked on the children, who appeared physically unharmed.

Defendant "actively" resisted officers as they placed him in handcuffs. Officers covered Defendant's naked body with a sheet as they took him outside to transport him to the Sheriff's Department. Defendant told officers that he was "Jesus of Nazareth."

Emergency medical personnel arrived at the residence and transported the victim to the hospital. Defendant's father, George Macken, came to stay with the children. He arrived as the victim was being loaded into an ambulance.

As a result of Defendant's actions, the Jackson County Grand Jury returned an indictment for attempted first degree murder, aggravated rape, especially aggravated kidnapping, and interference with emergency communication. At the three-day jury trial, both Detective Johnson and Deputy Buck testified. The jury also heard from the victim, who was able to complete the story of the events leading up to Defendant's arrest. Both the State and the defense presented expert testimony about Defendant's mental health.[1]

According to the victim's testimony at trial, earlier on the evening of December 10, 2018, the victim attended the Christmas program at their children's school. The victim taught at a middle school. When the victim arrived at home, Defendant told her that he needed to use her cell phone. The victim gave Defendant her phone. The evening continued as normal, with the victim putting the children to bed. After the children were in bed, the victim suspected Defendant was mad at her for something that happened earlier

---

[1] Because Defendant does not challenge anything related to his mental health or the testimony of these experts on appeal, we have chosen to omit this proof from this opinion.

in the week. Defendant locked the back door and unplugged the kitchen telephone. The victim described both acts as unusual. Defendant came toward her, grabbed her breast, and "put his tongue down [her] throat."

The victim, alarmed by Defendant's behavior, searched for her cell phone. She eventually found it in the bedroom, grabbed it, and ran into the adjacent bathroom. She locked the bathroom door. Inside the bathroom, the victim called Defendant's father and told him about Defendant's strange behavior.[2] Defendant tried to access the bathroom using a coat hanger.

The victim unlocked the door and tried to talk to Defendant. She took the coat hanger, bent it back into shape, and put it back in the closet. While she fixed the coat hanger, Defendant took her cell phone again. Defendant also took the victim's laptop. Frightened, the victim retreated to the bathroom again and locked the door. She felt "like a sitting duck" while Defendant kicked at the door. He put a hole in the door with his foot. The victim was afraid that Defendant might do something to the children, so she opened the bathroom door and told Defendant to calm down.

Defendant "body slammed" the victim "immediately" when she opened the door. It was "very violent[]," knocking the victim into a bed post a few feet from the bathroom door. Defendant pushed the victim onto the bed where she landed on her back. Defendant sat on top of her, held her down, and kicked her in the face with the heel of his foot. The victim recalled that after this "struggle," she managed to get up off the bed and tried to get to the telephone in the kitchen. Before she could escape, Defendant grabbed her hair and "twirl[e]d her like a rag doll." Defendant used the weight of his body to push her around. When the victim and Defendant finally made it to the kitchen, Defendant was totally naked.

The victim explained that "everything went downhill" once they were in the kitchen. Defendant again tackled the victim, causing her to fall backward and hit her head on the floor. Defendant again grabbed the victim's hair. Defendant held the victim down with his body weight and put his genitals in her face. Defendant shoved his penis into her mouth and his fingers into her vagina and anus. The victim cried and begged Defendant to stop. The victim struggled to breathe with Defendant's stomach and body weight on her face. Defendant did not remove his penis from the victim's mouth until he ejaculated.

After raping her, Defendant bit the victim as he held her down. He bit the knuckle of her left ring finger before he ripped her pajama pants completely off. Defendant bit her repeatedly on the stomach and leg. The victim described Defendant's actions as "animal-

---

[2] Defendant's father, George Macken, concerned about what he heard on the phone, left his home and started the nearly one-hour drive to Defendant's house.

like" "gnawing." The victim recalled Defendant biting one spot on the outside of her right leg before sucking on it for an extended period. The victim screamed as Defendant bit her, yelling for help. Defendant ordered her to be quiet.

Defendant also bit the victim's vagina. He ground his teeth back and forth on her labia so hard that the victim said it felt "like he was trying to sever it." He used his teeth like "scissors" and "never stopped biting," continuously "grind[ing] his teeth back and forth." Defendant pulled the victim's labia away from her body as he bit her, eventually severing a one-inch-long section of her left labia. She described the pain as "extreme" and "excruciating." The victim pleaded with Defendant, promised to be quiet, and promised to do anything he asked in exchange for letting her breathe. Defendant got up momentarily, and the victim ran to the telephone, plugged it in, and dialed 911. Defendant asked the victim what she was doing in a "very, very creepy tone." Defendant ripped the phone cord out of the wall. The victim thought that Defendant was going to kill her.

Defendant tackled the victim to the ground and resumed biting her body. The victim screamed because she could not escape. The police arrived shortly thereafter, breaking through the locked door.

Once the victim arrived at the hospital, medical personnel cleaned her bite wounds. The wounds could not be stitched. She received a shot and antibiotics and was told to follow up with her primary care physician. The hospital took pictures of her swollen left eye.

The victim described the pain as somewhere between five and seven on a scale of one to ten. The victim dressed the wounds daily and treated them with antibiotic ointment. She saw both her primary care physician and gynecologist and took four rounds of antibiotics in total.[3] The victim took photographs of her injuries as they healed and of the scars that remained after her injuries. The bite mark on the inside of her left thigh taken the night of the injury was an open bite wound surrounded by fresh and dried blood. The victim stated that this bite mark made it look like she was "mauled by a dog." The wound was "quite painful" and looked "quite gruesome," leaving a "nasty" scar. The wound to her outer right thigh caused an indentation that would require surgical intervention to correct. She took pictures of the bite marks on her abdomen. She described the healing process as "pretty gruesome" in part because it continued for an extended period and included nerve damage.

---

[3] The victim's medical records were not introduced at trial. During cross-examination, the victim was asked to read from a document that defense counsel identified as a medical record. This document was not admitted as an exhibit and was not authenticated. In the document, the victim's wounds were referred to as "superficial."

After a Momon hearing, Defendant elected not to testify.

At the conclusion of the jury trial, the jury found Defendant guilty of the lesser included offense of aggravated assault in Count One, aggravated rape, especially aggravated kidnapping, and interference with a 911 call. The trial court sentenced Defendant to an effective sentence of 20 years. Defendant filed a motion for new trial. The trial court denied the motion and Defendant appealed.

*Analysis*

On appeal, Defendant challenges the sufficiency of the evidence supporting his convictions for aggravated assault and especially aggravated kidnapping.[4] Specifically, Defendant argues that the only evidence regarding serious bodily injury to support the conviction for aggravated assault came from the "alleged victim, who simply testified that she experienced pain as a result of the assault." With respect to the conviction for especially aggravated kidnapping, Defendant argues that the "proof only established that the alleged victim was confined during the course of an alleged sexual assault and that the alleged victim experience[d] pain during the incident." The State insists that the evidence was sufficient to support both convictions.

When examining whether the evidence presented at trial was sufficient to support a conviction, several well-settled principles guide our analysis. We determine "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original); *see also* Tenn. R. App. P. 13(e). A guilty verdict removes the presumption of innocence and replaces it with a presumption of guilt. *State v. Evans*, 838 S.W.2d 185, 191 (Tenn. 1992). The defendant bears the burden on appeal to demonstrate that the evidence is insufficient to support his conviction. *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982).

"[A] jury verdict, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *State v. Harris*, 839 S.W.2d 54, 75 (Tenn. 1992). The State is entitled on appeal to "the strongest legitimate view of the evidence and to all reasonable and legitimate inferences that may be drawn therefrom." *State v. Elkins*, 102 S.W.3d 578, 581 (Tenn. 2003). As such, this Court is precluded from re-weighing or reconsidering the evidence when evaluating the

---

[4] Defendant does not challenge his remaining convictions or his sentence. As such, we will confine our discussion to the issues presented for review. *See* Tenn. R. App. P. 13(b) ("Review generally will extend only to those issues presented for review.").

- 5 -

convicting proof. *State v. Morgan*, 929 S.W.2d 380, 383 (Tenn. Crim. App. 1996); *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Moreover, we may not substitute our own "inferences for those drawn by the trier of fact from circumstantial evidence." *Matthews*, 805 S.W.2d at 779. Questions as to the credibility of witnesses and the weight of the evidence, as well as factual issues raised by such evidence, are resolved by the trier of fact, not this Court. *State v. Pruett*, 788 S.W.2d 559, 561 (Tenn. 1990). These principles guide us "'whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

### 1. Aggravated Assault

As charged in this case, a person commits aggravated assault by intentionally or knowingly committing an assault that results in serious bodily injury to another. T.C.A. §§ 39-13-101(a)(1), -102(a)(1)(A)(i). A person acts intentionally "when it is the person's conscious objective or desire to engage in the conduct or cause the result." T.C.A. § 39-11-302(a). A person acts knowingly "when the person is aware of the nature of the conduct or that the circumstances [surrounding the conduct] exist" or "when the person is aware that the conduct is reasonably certain to cause the result." *Id.* at (b). Serious bodily injury as relevant to this case includes bodily injury that involves "[e]xtreme physical pain" or "[p]rotracted or obvious disfigurement." *Id*. § 39-11-106(37)(C), (D). "In contrast, 'bodily injury,' an element of the misdemeanor offense of assault, includes 'a cut, abrasion, bruise, burn or disfigurement; physical pain or temporary illness or impairment of the function of a bodily member, organ or mental faculty.'" *State v. Barnes*, 954 S.W.2d 760, 765 (Tenn. Crim. App. 1997) (citing T.C.A. §§ 39-13-101(a)(1); 39-11-106(a)(2)). As this Court has explained:

> While the phrase "serious bodily injury," an essential element of the offense of aggravated assault, is not susceptible to precise legal definition, it must describe an injury of a greater and more serious character than that involved in a simple assault. The distinction between "bodily injury" and "serious bodily injury" is generally a question of fact for the jury and not one of law.

*Id.* at 765-66.

Defendant relies on *State v. Farmer*, 380 S.W.3d 96 (Tenn. 2012), to support his argument that the State failed to prove serious bodily injury "via extreme physical pain." In *Farmer*, the victim was shot in the leg and testified that he "experienced pain." *Farmer*, 380 S.W.3d at 98, 101. "[T]he wound required minimal medical treatment and did not cause the victim to suffer a loss of consciousness, extreme pain, disfigurement, or impairment." *Id*. at 98. The supreme court reduced the conviction from especially

- 6 -

aggravated robbery to aggravated robbery because the victim did not suffer a serious bodily injury. *Id.* The State disagrees with Defendant's assessment, arguing that not only did the victim suffer extreme physical pain, but she also suffered protracted or obvious disfigurement. The State insists that Defendant waived any challenge to the aggravated assault conviction based on disfigurement for failing to include it in his argument on appeal.

In our view, *Farmer* can be distinguished from Defendant's case. Here, the victim stated that Defendant bit her repeatedly in the abdomen, legs, and genitals in an animalistic way. The victim testified that the pain was "excruciating," and rated her pain level at a five to seven out of ten as Defendant bit her and ground his teeth back and forth on her labia "like he was trying to sever it." One of the officers described Defendant's actions as "cannibalism" and another officer described it as one the "worst" things he had ever seen as an officer. This Court has held that the subjective nature of pain is a fact to be determined by the trier of fact. *State v. Dedmon*, No. M2005-00762-CCA-R3-CD, 2006 WL 448653, at *5 (Tenn. Crim. App. Feb. 23, 2006), *no perm. app. filed*.

In his principal brief, Defendant does not challenge whether the victim's injuries constituted "protracted or obvious disfigurement" that would satisfy the serious bodily injury element. In fact, as noted above, the State insists that Defendant waives any claim with respect to this argument for failing to address it on appeal. In a reply brief, Defendant asserts that the State relied only on a theory of "extreme physical pain" at trial to prove that the victim suffered serious bodily injury and that even if the State pursued a theory of "protracted or obvious disfigurement," the evidence would not have supported the conviction on that ground. We disagree with Defendant. The State was not required to elect on which theory of serious bodily injury it relied. Serious bodily injury is defined by statute. *See* T.C.A § 39-11-106(37). The statute lists different means by which serious bodily injury is satisfied.

> Where the intent with which, the mode in, or the means by which, an act is done are essential to the commission of the offense, and the offense may be committed with different intents, in different modes, or by different means, if the jury is satisfied that the act was committed with one (1) of the intents, in one (1) of the modes, or by either of the means charged, the jury shall convict, although uncertain as to which of the intents charged existed, or which mode, or by which of the means charged, the act was committed.

T.C.A. § 40-18-112. The statutory definition of serious bodily injury simply provides alternative means by which the result of a defendant's actions fulfills the serious bodily injury element of aggravated assault. If we were to accept Defendant's argument, it would mean we were effectively requiring the State to elect facts to satisfy the mode on which it

relied to support the element of serious bodily injury. No law requires the State to do so in this context.

Here, in addition to the victim's testimony about her pain, multiple photographs showed the victim's injuries, and she testified that she still has many scars from Defendant's bites—on the inside of her left thigh, her abdomen, her upper left thigh, and her genitals. The victim also had an indentation on her right thigh that could only be corrected surgically. Protracted, as relevant here, means "delayed or prolonged in time." *State v. Denton*, No. 02C01-9409-CR-00186, 1996 WL 432338, at *5 (Tenn. Crim. App. Aug. 2, 1996) (first citing Merriam Webster's Collegiate Dictionary 939 (10th ed. 1994); and then citing American Heritage Dictionary 568 (1975)) (determining the meaning of protracted unconsciousness as a basis for serious bodily injury), *no perm. app. filed*. The record shows that the incident causing the victim's injuries occurred in December of 2018. At the trial in April of 2022, over three years after the offense, the victim still suffered from scarring from the bites. This Court has consistently held that a scar is sufficient to support the element of serious bodily injury. *See State v. Martin*, No. M2013-00569-CCA-R3-CD, 2014 WL 1102010, at *11 (Tenn. Crim. App. Mar. 20, 2014); *State v. Reece*, No. M2011-01556-CCA-R3-CD, 2013 WL 1089097, at *14 (Tenn. Crim. App. Mar. 14, 2013) (citing cases in which this Court held that a scar constitutes protracted or obvious disfigurement for the purpose of establishing serious bodily injury), *perm. app. denied* (Tenn. June 17, 2013); *State v. Matthews*, No. M2010-00647-CCA-R3-CD, 2012 WL 5378046, at *4 (Tenn. Crim. App. Oct. 31, 2012) (same), *perm. app. denied* (Tenn. Aug. 26, 2014); *State v. Capps*, No. M2010-02143-CCA-R3-CD, 2012 WL 3800848, at *7 (Tenn. Crim. App. Sept. 4, 2012) (holding that the victim's scar from a two-inch laceration on his ear was sufficient to establish serious bodily injury), *perm. app. denied* (Tenn. Feb. 13, 2013); *State v. Forster*, No. M2002-0008-CCA-R3-CD, 2011 WL 1431980, at *10 (Tenn. Crim. App. April 12, 2011) (concluding that the victim's scar, which began in the middle of the bridge of her nose and ended at her lip, was sufficient to establish the element of serious bodily injury), *perm. app. denied* (Tenn. Aug. 24, 2011); *State v. Sullivan*, No. M2004-03068-CCA-R3-CD, 2006 WL 644021, at *8 (Tenn. Crim. App., Mar. 10, 2006) (concluding that two-inch scar from a gunshot wound to the shoulder was sufficient for a jury to find protracted and obvious disfigurement), *no perm. app. filed*. Accordingly, we conclude that there is sufficient evidence to support a finding of serious bodily injury based on the victim's protracted or obvious disfigurement, together with the extremely physical pain about which she testified.

After reviewing the evidence in the light most favorable to the State, we conclude that a rational trier of fact could have found beyond a reasonable doubt that the victim was in "extreme physical pain" and/or the scars from her bite marks constituted "[p]rotacted or obvious disfigurement. Thus, there was more than sufficient evidence of "serious bodily injury" to support Defendant's conviction for aggravated assault. Defendant has not

challenged whether he acted intentionally or knowingly. Accordingly, Defendant's conviction for aggravated assault is affirmed.

## 2. *Especially Aggravated Kidnapping*

Defendant also challenges the sufficiency of the evidence supporting his especially aggravated kidnapping conviction because he insists that the kidnapping was "essentially incidental" to the underlying assault and the proof was insufficient to establish that the victim sustained serious bodily injury. The State argues that because Defendant locked the doors to the house and removed "every means of communication otherwise available" to the victim, Defendant's confinement of the victim exceeded that necessary to accomplish the underlying assault.

"Especially aggravated kidnapping is false imprisonment . . . [w]here the victim suffers serious bodily injury." T.C.A. § 39-13-305(a). False imprisonment occurs when "[a] person . . . knowingly removes or confines another unlawfully so as to interfere substantially with the other's liberty." *Id.* § 39-13-302(a). Removal or confinement is unlawful when it "is accomplished by force, threat or fraud[.]" *Id.* § 39-13-301(15). Because we have already determined that the victim suffered a serious bodily injury, we must determine if the evidence at trial proved that Defendant knowingly removed or confined the victim unlawfully so as to interfere substantially with her liberty.

When a defendant is charged with kidnapping and another crime against the person regarding the same victim, such as assault, the jury must be instructed that it may "return [a] kidnapping conviction[] only [if] the victim's removal or confinement exceeds that which is necessary to accomplish the accompanying felony." *State v. White*, 362 S.W.3d 559, 578 (Tenn. 2012); *see State v. Teats*, 468 S.W.3d 495, 502 (Tenn. 2015). The *White* court provided the appropriate instruction a trial court must give to the jury, which was subsequently adopted in the Tennessee Pattern Jury Instructions. *State v. Williams*, No. M2016-00568-CCA-R3-CD, 2017 WL 1063480, at *4 (Tenn. Crim. App. Mar. 21, 2017) (first citing *White*, 362 S.W.3d at 580-81; and then citing 8 Tenn. Prac. Pattern Jury Instr. T.P.I. - Crim. 8.03(a)), *perm. app. denied* (Tenn. July 19, 2017). The inquiry of whether the confinement of the victim was essentially incidental to the underlying felony "is a question for the jury after appropriate instructions, which appellate courts review under the sufficiency of the evidence standard as the due process safeguard." *White*, 362 S.W.3d at 562. Here, Defendant does not contest that the trial court instructed the jury properly; therefore, the appropriate analysis is under the sufficiency of the evidence standard.

The evidence at trial indicated that Defendant locked all the doors to the house and took the victim's cell phone and laptop. Defendant even unplugged the home phone from the wall, eliminating every form of communication available to the victim. The victim

herself testified that she was a "sitting duck" and could not escape the house. Defendant used his body weight to tackle her to the floor in the kitchen, where she hit her head before Defendant sexually penetrated her. He used his body to further constrain the victim, sitting on top of her as he raped her. When the rape was over, Defendant continued to hold the victim down, biting her stomach, legs, and genitals. At one point, Defendant stopped when the victim promised to do anything that he wanted. The victim was able to get up, plug in the phone, and call 911. Defendant used a "creepy" voice to ask the victim what she was doing and then he jerked the phone cord out of the wall, tackled the victim to the ground again, and resumed biting her until police arrived. The evidence supports the conclusion that the confinement of the victim in this case was not merely incidental to the rape and aggravated assault. Therefore, the evidence is sufficient to sustain Defendant's convictions.

### *Conclusion*

For the foregoing reasons, the judgments of the trial court are affirmed.

_____
TIMOTHY L. EASTER, JUDGE